**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF IOWA**
**CEDAR RAPIDS DIVISION**

EILEEN McDERMOTT,

            Plaintiff,

vs.

MICHAEL J. ASTRUE,
Commissioner of Social Security,[1]

            Defendant.

No. 06-CV-14-LRR

**ORDER**

---

### TABLE OF CONTENTS

I.      *INTRODUCTION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **2**

II.    *PRIOR PROCEEDINGS* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **2**

III.   *PRINCIPLES OF REVIEW* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **3**

IV.   *MEDICAL EVIDENCE* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **4**
      *A.*    *McDermott's Background* . . . . . . . . . . . . . . . . . . . . . . . . **4**
      *B.*    *McDermott's Testimony* . . . . . . . . . . . . . . . . . . . . . . . . . **5**
      *C.*    *Consulting Sources* . . . . . . . . . . . . . . . . . . . . . . . . . . . . **6**
            *1.*    *Dr. Wilson* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **6**
            *2.*    *Dr. Elliot* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **6**
            *3.*    *Dr. Schuett* . . . . . . . . . . . . . . . . . . . . . . . . . . . . **7**
      *D.*    *Treating and Examining Sources* . . . . . . . . . . . . . . . . . . . . **8**

V.     *CONCLUSIONS OF LAW* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **16**
      *A.*    *ALJ's Disability Determination* . . . . . . . . . . . . . . . . . . . . . **16**
      *B.*    *McDermott's RFC* . . . . . . . . . . . . . . . . . . . . . . . . . . . . **19**
      *C.*    *Reversal or Remand* . . . . . . . . . . . . . . . . . . . . . . . . . . . **23**

VI.   *DISPOSITION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **24**

---

[1] Plaintiff Eileen McDermott originally filed this case against Jo Anne B. Barnhart, the Commissioner of the Social Security Administration ("SSA"). On February 12, 2007, Michael J. Astrue became Commissioner of the SSA. The court, therefore, substitutes Commissioner Astrue as the defendant in his action. Fed. R. Civ. P. 25(d)(1).

# I. INTRODUCTION

Plaintiff Eileen McDermott ("McDermott") seeks judicial review of the Social Security Commissioner's decision to deny her application for Disability Insurance Benefits ("DIB"), which she sought under Title II of the Social Security Act ("Act"), 42 U.S.C. § 401, *et seq.* (docket no. 3). McDermott asks the court to reverse and order the Social Security Commissioner ("Commissioner") to provide her DIB.

# II. PRIOR PROCEEDINGS

On December 30, 2002, McDermott applied for DIB, alleging an inability to work since June 24, 2002, due to dermatomyositis and the side effects of her prescribed medications. She claimed that the disease caused weakness in her muscles and joints and prevented her from walking and standing. On April 1, 2003, the Commissioner denied McDermott's DIB application. On September 4, 2003, it was also denied on reconsideration.

On November 6, 2003, McDermott requested an evidentiary hearing before an Administrative Law Judge ("ALJ"). On September 17, 2004, McDermott appeared with counsel before ALJ Peter J. Baum for an evidentiary hearing ("Hearing"). McDermott was the only witness who testified at the Hearing. After the Hearing, the ALJ ordered McDermott to be evaluated by a Disability Determination Services ("DDS") physician. On January 26, 2005, DDS physician Clayton T. Schuett, D.O. ("Dr. Schuett"), performed an evaluation and made a report. In a decision dated March 21, 2005, the ALJ denied McDermott's application. The ALJ determined that, although McDermott cannot perform her relevant past work, she has the residual functional capacity ("RFC") for sedentary occupations that are available in significant numbers in the national economy.

On May 18, 2005, McDermott sought review of the ALJ's decision. On November 25, 2005, Administrative Appeals Judge Dianne Egan Bobowski denied

Case 1:06-cv-00014-LRR   Document 16   Filed 07/31/07   Page 2 of 24

McDermott's request for review. Consequently, the ALJ's March 21, 2005 decision stands as the Commissioner's final decision.

On January 25, 2006, McDermott filed this action for judicial review. On July 7, 2006, the Commissioner filed an answer. On September 6, 2006, McDermott filed a brief arguing that there is not substantial evidence in the record to support a finding that she has the physical RFC to perform sedentary labor. On November 3, 2006, the Commissioner filed a responsive brief arguing that the ALJ's decision was correct and asking this court to affirm the ALJ's decision.

The court finds this matter fully submitted and ready for decision.

### III. PRINCIPLES OF REVIEW

Pursuant to 42 U.S.C. § 405(g), the court may conduct a judicial review of the Commissioner's final decision. 42 U.S.C. § 405(g) (providing that "[a]ny individual, after any final decision of the [Commissioner] made after a hearing to which he was a party . . . may obtain a review of such decision . . . ."). "The court shall have the power to enter . . . a judgment affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." *Id.* "The findings of the [Commissioner] as to any fact, if supported by substantial evidence, shall be conclusive . . . ." *Id.*

The court must consider whether "substantial evidence on the record as a whole supports the Commissioner's decision . . . ." *Schultz v. Astrue*, 479 F.3d 979, 982 (8th Cir. 2007); *Pirtle v. Astrue*, 479 F.3d 931, 933 (8th Cir. 2007). "Substantial evidence is less than a preponderance, but enough that a reasonable mind would find it adequate to support the ALJ's determination." *Pirtle*, 479 F.3d at 933. The court reviews both the evidence that supports and detracts from the Commissioner's decision. *Id.* If the ALJ's credibility determinations are "supported in the record by substantial evidence," the court must defer to them. *Id.* It shall not reverse the Commissioner's decision "simply because

3

some evidence supports a conclusion other than that of the Commissioner." *Id.* The court must not re-weigh the evidence, but rather simply inquire as to whether "a reasonable person would find [the evidence] adequate to support the ALJ's determination." *Vester v. Barnhart*, 416 F.3d 886, 889 (8th Cir. 2005) (citing *Sultan v. Barnhart*, 368 F.3d 857, 862 (8th Cir. 2004), and *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005)). Although inaccuracies and unresolved conflicts of evidence can serve as a basis for remand, "a 'deficiency in opinion-writing is not a sufficient reason to set aside an ALJ's finding where the deficiency [has] no practical effect on the outcome of the case . . . .'" *Draper v. Barnhart*, 425 F.3d 1127, 1130 (8th Cir. 2005) (quoting *Reeder v. Apfel*, 214 F.3d 984, 988 (8th Cir. 2000)).

## IV.  MEDICAL EVIDENCE

### A.  McDermott's Background

McDermott was born on March 2, 1958. She attended high school through eleventh grade and later obtained her GED. She has no college or vocational education. Between January of 1991 and June of 2002, McDermott worked as a custodial supervisor for College Community Schools in Cedar Rapids, Iowa. She has a history of alcohol dependency as well as some cocaine and marijuana use. She is also a smoker.

On June 24, 2002, at age 44, doctors at the University of Iowa Hospitals and Clinics ("UIHC") diagnosed McDermott with dermatomyositis, a long-term skin disease that attacks the autoimmune system and causes rashes and muscle weakness. To treat the disease, she takes Prednisone, a drug that suppresses her immune system.

On August 26, 2002, McDermott was admitted to the UIHC with "fever and respiratory distress." Between August 26, 2002, and October 8, 2002, the date she was discharged from the UIHC, McDermott was diagnosed with dermatomyositis, presumed fungal pneumonia with respiratory failure, acute renal failure, Hepatitis C, hypertension and hyperlipidemia. She was admitted into the UIHC's Intensive Care Unit, where she

4

required mechanical ventilation. Among other treatments, McDermott was given "broad-spectrum antibiotics including a full course of antifungals out of concern for her immunocompromised status" and underwent surgery for a rectal ulcer.

On October 8, 2002, McDermott was discharged from the UIHC and admitted into the rehabilitation unit at St. Luke's Hospital ("St. Luke's") in Cedar Rapids, Iowa. On October 24, 2002, after completing a physical therapy rehabilitation program, she was discharged from St. Luke's.

On August 18, 2004, McDermott had a stroke. At about 2:00 p.m., while she was visiting with friends at a local tavern, McDermott experienced serious dizziness, lost the ability to speak or write and felt much weaker on her right side than her left. She was taken by ambulance to St. Luke's and then hospitalized until August 21, 2004, at the UIHC.

### B.  McDermott's Testimony

On September 17, 2004, at her Hearing before the ALJ, McDermott testified that she had been receiving long-term disability payments from the school where she worked. When her dermatomyositis periodically flares up, it causes (1) her muscles to get so weak that she cannot "get out of bed," (2) her skin to become irritated and (3) susceptibility to stroke. She testified that she has "constant headaches" and occasional difficulty speaking as a result of the medications she had been taking since her stroke. She had gained around forty pounds since 2002 and also suffered from swelling in her lower legs due to the Prednisone. She testified that she receives intravenous infusions to boost her immune system during the flare ups.

McDermott testified that she is unable to stand for a prolonged amount of time and can only sit for up to forty-five minutes before she must stand up and stretch due to edema, or excessive fluid, in her legs. She can only walk up to a block at a time and must use her shopping cart for support when at the grocery store. She testified that she is capable of

5

performing most of her own housework, including standing to wash dishes and doing her own laundry. She can also drive, although she testified that she had not left the Cedar Rapids area "recently." She testified that she generally spends her days reading, doing "light housework," visiting her parents and watching television. She frequently naps.

McDermott testified that she attended physical therapy in the summer of 2003. She exercised in a pool and was able to exercise up to fifteen minutes on a stationary bike. At the time of the Hearing, she was unable to use a treadmill because climbing stairs to access a treadmill at her health club was too difficult.

### C. Consulting Sources

#### 1. Dr. Wilson

On April 1, 2003, J.D. Wilson, M.D. ("Dr. Wilson"), reviewed McDermott's medical records on a consultative basis. Dr. Wilson determined that McDermott could perform sedentary labor subject to some physical limitations. He concluded that McDermott could occasionally lift up to ten pounds and frequently lift less than ten pounds. Dr. Wilson determined that McDermott could stand at least two hours in a workday and that she could sit about six hours in a work day. He determined that she had unlimited pushing, pulling, manipulative, visual and environmental capabilities, but that she should avoid concentrated exposure to hazards like machinery and dangerous heights. Dr. Wilson also found that McDermott could occasionally stoop, kneel, crouch, crawl and climb stairs, but that she should never climb ladders or scaffolding.

#### 2. Dr. Elliot

On August 14, 2003, Stephen Elliot, Ph.D, D.O. ("Dr. Elliot"), reviewed McDermott's medical records on a consultative basis. Dr. Elliot recommended that the Commissioner deny, on reconsideration, McDermott's application for DIB. Dr. Elliot verified that McDermott has pain in her neck and numbness in her feet and thighs that is made worse by "standing too long and heat and/or sun or walking for an extended period

6

of time." He found that McDermott has trouble raising her arms above her head and is too weak to lift more than five to six pounds. However, Dr. Elliott also afforded controlling weight to the UIHC physicians who had been treating McDermott for dermatomyositis, because those physicians had "extensive and complete records" and because they are the ones "primarily treating her main disease." Dr. Elliot noted that McDermott's UIHC physicians found her to be a "healthy appearing female in no distress," and they stated that she has "5/5 strength" in her extremities. Dr. Elliott also surmised that McDermott does not have Hepatitis C, because earlier diagnoses were false positives. Dr. Elliot concluded that McDermott is capable of sedentary labor. He determined that she could lift less than ten pounds on a regular basis, stand or walk for at least two hours in an eight-hour workday, sit about six hours in an eight-hour work day, and otherwise had unlimited pushing and pulling capabilities. Dr. Elliot found that McDermott could occasionally climb, stoop, kneel or crouch, but that she could never climb ladders or scaffolding. He found that she had no visual, communicative or manipulative limitations but that she should avoid concentrated exposure to extreme heat and cold. He indicated that he disagreed with one of McDermott's treating physicians, Paul J. Guidos, M.D. ("Dr. Paul Guidos"), who had concluded that McDermott was "completely" disabled.

### 3. *Dr. Schuett*

On January 26, 2005, DDS physician Clayton T. Schuett, D.O. ("Dr. Schuett"), evaluated McDermott, pursuant to the ALJ's order. Dr. Schuett conducted a physical examination and reviewed McDermott's medical records. Dr. Schuett concluded that McDermott suffered from lethargy; mild weakness in her upper extremities, knees and hips; and had a rash around her neck and forearms. As to McDermott's ability to work, Dr. Schuett concluded:

> I do think that [McDermott] probably wears out and tires out
> very easily even though her overall strength is not decreased

7

significantly at this point and time. Certainly this is a complication of her dermatomyositis. . . . I do think that she is capable [of] doing a job that is more sedentary in nature where she is doing a lot of sitting. Potentially using her arms to some degree. She will probably need frequent breaks. . . . I do think [her endurance and tolerability] can be improved yet.

Dr. Schuett went on to conclude that McDermott was capable of managing her finances, lifting up to ten pounds at a time and walking up to half a block at a time.

### D. Treating and Examining Sources

On July 5, 2002, McDermott was examined by dermatologists at the UIHC, mainly due to her dermatomyositis. The doctors stated that, "although the patient is tired[,] she has the ability to continue work."

On October 7, 2002, UIHC physical therapist Janine M. Kelly ("Ms. Kelly") assessed McDermott while she was an inpatient at the UIHC. Ms. Kelly noted that McDermott needed to use a walker to walk and required assistance sitting down and standing up.

On October 8, 2002, McDermott was discharged from the UIHC by James L. Carroll, Jr., M.D. ("Dr. Carroll"), of the UIHC Pulmonary Clinic. In the discharge papers, Dr. Carroll noted that he and McDermott's other health care providers in the UIHC Pulmonary Clinic "expect[ed] a full recovery." The UIHC doctors recommended transferring McDermott to an "acute rehab facility" in Cedar Rapids, and they scheduled follow-up appointments in several departments, including appointments at the Pulmonary Clinic, the Hepatology Clinic, the Rheumatology Clinic and with a substance abuse counselor.

Later on October 8, 2002, McDermott was admitted to St. Luke's acute rehabilitation program. Lisa M. Hazelton, M.D. ("Dr. Hazelton"), conducted a consultation. In Dr. Hazelton's consultation report, she summarizes McDermott's

8

hospitalization and states that McDermott "has actually recovered fairly well." Dr. Hazelton stated that McDermott "is weak which is the reason for rehab, but a full recovery is anticipated." Dr. Hazelton found McDermott to be "alert and oriented times three." Dr. Hazelton reported that McDermott had "no other major physical concerns [at the time of the consultation] other than her weakness." On the same date, October 8, 2002, AnnaMaria Guidos, M.D. ("Dr. AnnaMaria Guidos"), also conducted a consultation and established the rehabilitation plan.

On October 10, 2002, a multidisciplinary team led by Dr. AnnaMaria Guidos met to discuss McDermott. At that time, Dr. AnnaMaria Guidos noted that McDermott had a "decreased ability in self-cares, decreased ability to perform transfers and activities of daily living." Dr. AnnaMaria Guidos stated that "[p]hysical assistance [that] the patient needs at this point is beyond the capability of the identified caregiver." The team "felt" that they would "be able to improve [McDermott's] overall strength and endurance" with about three weeks of rehabilitation.

October 10, 11 and 14, 2002, Linda Collins, Ph.D ("Dr. Collins"), conducted a neuropsychological evaluation of McDermott. Dr. Collins reported that McDermott was alert and fully oriented and that she understood the reason for the evaluation. Dr. Collins found that McDermott's performance was mildly impaired when she was asked to complete a task that required complex attention or working memory. "[O]n a measure of fine manual coordination and motor speed[,]" her right hand performance was mildly impaired and her left hand performance was severely impaired. Dr. Collins further noted: "Bilateral shaking was noted in both hands during all fine manual motor activities." McDermott's speech performance and production were both within normal limits. Dr. Collins classified McDermott's learning and memory as "low average" and average. McDermott's insight and judgment were "relatively poor." Dr. Collins found that McDermott "tends to respond to stress with increased physical complaints." In summary,

9

Dr. Collins wrote that the evaluation "reveal[ed] deficits in attention, problem solving, mental flexibility, ability to benefit from feedback, and bilateral fine manual coordination and motor speed." Dr. Collins stated that, "[a]lthough [McDermott had] several areas of cognitive deficit, [she has] the capacity to make knowledgeable legal, financial and medical decisions." She concluded that McDermott could not drive a vehicle and that, at that time, she was "unable [to] return to full-time competitive employment." Dr. Collins recommended that a "brief neuropsychological evaluation" be conducted on McDermott "prior to return[ing] to work or driving."

On October 24, 2002, McDermott was discharged from St. Luke's rehabilitation program. Dr. AnnaMaria Guidos wrote a discharge diagnosis, which provided:

> Significant decrease of ability for self-care skills, mobility, transfers and activities of daily living secondary to medical problems including dermatomyositis, pneumonia, respiratory failure, acute renal failure, chronic [H]epatitis C, hypertension, hyperlipidemia, status post hysterectomy, history of substance abuse, gastroesophageal reflux disease, status post right tibial plateau fracture in 1988, history of Epstein-Barr virus, history of prolonged ventilation requiring tracheostomy at the [UIHC] resulting in closure in tracheostomy scar, previous history of dialysis with improvement of renal function. For other medical problems, please refer to the [UIHC] chart as well as the present chart.

McDermott was "medically stable" at the time of her discharge.

On October 30, 2002, Gina M. Perri, M.D. ("Dr. Perri"), McDermott's primary care physician, examined McDermott for the first time after her hospitalization. At that time, Dr. Perri stated that McDermott was "using a walker to get around" but that she was "expected to make a full recovery." Despite having an elevated blood pressure, Dr. Perri did not adjust McDermott's medications because she was under the care of Dr. Hazelton.

On November 8, 2002, Scott Vogelgesang, M.D. ("Dr. Vogelgesang"), examined McDermott in the UIHC Rheumatology Clinic. Dr. Vogelgesang concluded that

10

McDermott "had a remarkable improvement" since her hospitalization, although she did have elevated blood pressure. On December 31, 2002, Dr. Vogelgesang examined McDermott again and stated that she "continue[d] to have progressive improvement in muscle strength" and that her dermatomyositis rash remained stable.

On January 17, 2003, Dr. Paul Guidos examined McDermott and wrote an outpatient follow-up note. At that time, due to McDermott's progress, Dr. Paul Guidos recommended decreasing physical therapy appointments to one time per week, and continuing a home therapeutic exercise program. He wrote that McDermott was "concerned about upper respiratory infection but her lungs were completely clear today . . . ."

On February 25, 2003, Dr. Warren W. Piette, M.D. ("Dr. Piette"), of the UIHC Dermatology Clinic examined McDermott. Dr. Piette referred to McDermott's dermatomyositis and stated that her medications provided her with "good control of her disease." At that time, McDermott denied any muscle weakness and Dr. Piette described her as a "[h]ealthy-appearing white female in no acute distress." Dr. Piette's impression was that McDermott was having a "cutaneous flare up" of her dermatomyositis, and he prescribed various medications, including topical ointments and creams. Dr. Piette contacted Dr. Vogelgesang to determine whether it was safe to restart McDermott on a medication.

On March 4, 2003, Dr. Piette called McDermott and she reported that she "fe[lt] good with improvement since last visit." However, on March 6, 2003, McDermott contacted Dr. Piette and reported a "worsening rash."

On March 14, 2003, McDermott was examined by Loreen Herwaldt, M.D. ("Dr. Herwaldt") at the UIHC Infectious Disease Clinic. At that time, Dr. Herwaldt stated that, "[w]ith the exception of the skin disease, [McDermott] reports that she is feeling well."

McDermott had a CT scan of her chest, which showed "near-complete resolution of the previous abnormalities, suggestive of fungal pneumonia."

On March 20, 2003, Dr. Paul Guidos examined McDermott and stated that she had experienced a "re-exacerbation of her dermatomyositis and [felt] miserable." McDermott "continue[d] to have severe itching and discomfort in her skin" and she was having "significant problems with weakness."

On April 8, 2003, Marta VanBeek, M.D. ("Dr. VanBeek"), of the UIHC Dermatology Clinic, examined McDermott and determined that her dermatomyositis had "improved." On May 7, 2003, and June 3, 2003, Dr. Piette examined McDermott and concluded that her dermatomyositis was stable with active erythema, or redness. During each of these three examinations by dermatologists, the physicians described McDermott as a "[h]ealthy appearing white female in no acute distress" and found that her strength was "5/5 in upper and lower extremities bilaterally." On the latter two reports, Dr. Piette states that the purpose of the appointment was to "follow-up dermatomyositis with total resolution of pruritus."

On April 24, 2003, Dr. Paul Guidos noted improvement in McDermott's symptoms, and he wrote that he filled out life insurance forms for McDermott "stating that she is classified severed limitation of functional capacity secondary to the severe nature of her symptoms." He further wrote: "[W]e feel the patient is completely and totally disabled secondary to the dermatomyositis which causes a severe myopathy or muscle weakness. We did fill out forms today for her."

In a report dated June 3, 2003, Dr. Paul Guidos noted that McDermott's blood pressure was "much improved." She appeared to be "feeling better" and had been doing her physical therapy at a local fitness facility.

On June 19, 2003, physical therapist Steven P. Thomas ("Mr. Thomas") examined McDermott. Mr. Thomas stated that McDermott "continues to improve with proximal

Case 1:06-cv-00014-LRR   Document 16   Filed 07/31/07   Page 12 of 24

muscle weakness . . . ."  Mr. Thomas also stated that her blood pressure was within the normal limits and "had no real shortness of breath."

On June 24, 2003, Dr. Paul Guidos examined McDermott again and stated, in part, the following:

> She continues to have extremely red, and at times purplish type skin, especially on her face and upper extremities.  It does appear to be somewhat improved but is still present. . . . She is showing improved strength.  However, endurance and fatigue issues continue to be problematic.  Neurological examination is continuing to show a slight proximal muscle weakness in both shoulders and hips. . . .

McDermott's active physical therapy was discontinued on that date.

On June 30, 2003, Mr. Thomas signed a joint report with Dr. Paul Guidos, who signed it on July 9, 2003.  At that time, they concluded that McDermott's muscle strength was continuing to improve, she had "noticeable improvement" in her color, her blood pressure was within normal limits and she had "no real shortness of breath."

In an undated form letter from Dr. Paul Guidos to the Office of Vehicle Services, he requested that McDermott receive a disabled parking permit.  In the letter, Dr. Paul Guidos checked the blank line which explained that McDermott is "severely limited in [her] ability to walk due to an arthritic, neurological, or orthopedic condition" and he represented that McDermott's disability was temporary.

On October 9, 2003, McDermott began seeing Dr. Perri as her primary care physician again.  Dr. Perri stated that, "generally [McDermott] has been doing pretty well."

On December 23, 2003, Dr. Piette examined McDermott and stated that she had experienced one dermatomyositis "flare" in a one-month period.  He stated that, she had been experiencing a flare every two to three months, during which she experiences "significant worsening of her skin including redness and pruritus, as well as decreased

13

muscle strength." With regard to the two intravenous immunoglobulin ("IVIG") treatments McDermott underwent in September and October of 2003, Dr. Piette reported: "The patient reports excellent improvement of her dermatomyositis with the IVIG . . . . She does have a mild infusion reaction consisting of fevers and chills; however, this is tolerable to her." Dr. Piette described her muscle strength as "5/5 in the bilateral upper and lower extremities" and stated that she was "able to stand from sitting with crossed arms with only mild difficulty." Dr. Piette determined that McDermott would be treated with IVIG every two months, but that she would not begin her third course of IVIG treatment until she experienced "even a mild flare" of the dermatomyositis.

On February 17, 2004, Dr. Piette examined McDermott and stated in his report that she had experienced "no flares since her last visit [on December 23, 2003], though she typically flares every 2-3 months." He stated: "Overall, her muscle strength is good." He stated that she had "excellent improvement" with "2 courses of IVIG in September 2003 spaced 6 weeks apart." The IVIG treatments gave McDermott "mild fevers and chills," but those side effects were "tolerable to her." Dr. Piette stated:

> Overall, the patient is doing very well. She does have some persistent pruritis and redness on her arms, neck, chest, and face. Her muscle strength is improved, though she does continue to have some difficulty climbing stairs.

Dr. Piette again described her muscle strength as "5/5 in the bilateral upper and lower extremities" and stated that she was "able to stand from sitting with crossed arms with only mild difficulty." Dr. Piette determined that McDermott would be treated with IVIG every two to four months, and that she would begin her third course when she experienced a mild flare of the dermatomyositis.

On May 11, 2004, Dr. Piette conducted a follow-up examination of McDermott after a flare up of her dermatomyositis. He noted that, in September of 2003, McDermott had taken "2 courses of IVIG" and had experienced "excellent improvement" in her

14

dermatomyositis.  Dr. Piette said that, in the three to four weeks prior to May 11, 2004, McDermott had experienced increased erythema and itching, particularly on her forearms. Upon examination, Dr. Piette determined that McDermott's "muscle strength is 5/5 in upper and lower extremities."

On March 9, 2004, Dr. Carroll conducted a follow-up examination of McDermott. In his report, Dr. Carroll stated:  "[McDermott] appears to be in good condition from her respiratory standpoint."  Dr. Carroll encouraged McDermott to quit smoking cigarettes and increase her physical activity.

On June 22, 2004, Dr. Perri wrote, in part, that McDermott needed

> a note written for work to the extent that she cannot return to work at this time.  Essentially [McDermott] is disabled from her dermatomyositis and she says she went to Iowa City and they told her that she was only 60% recovered and apparently in order for her to go back to work she needs to be 80% recovered.  She is getting disability income at this time so working on that. . . .  Gave note that she is not able to return to work.

Record at 295 (grammatical errors in original).

By July 27, 2004, Dr. Piette examined McDermott again.  At that time, Dr. Piette found McDermott to have "excellent improvement" with the IVIG therapy in the past "with only a mild infusion reaction with fever and chills."  He noted that her face had "mild patchy erythema" and her forearms had "erythematous papules."  Therefore, Dr. Piette scheduled McDermott for three IVIG therapy sessions, which would last seven or eight hours per day for a three-day period.  On August 2, 3 and 4, 2004, McDermott underwent the IVIG therapy.

On August 18, 2004, when McDermott was taken by ambulance to St. Luke's due to her stroke, Scott D. Geisler, M.D. ("Dr. Geisler"), examined her.  Dr. Geisler determined that McDermott had regained control of her right extremities and was able to "get all her thoughts out," despite having some problems with halting speech.  That same

day, McDermott was transferred to the UIHC and admitted. On August 18, 2004, and again, prior to her discharge on August 21, 2004, McDermott told doctors at the UIHC that she was "back to normal with the exception of feeling light headed" and that she and her parents felt that her speech had returned to normal. On both dates, McDermott denied having "numbness or weakness." However, on August 21, 2004, McDermott's treating physicians at the UIHC Neurology Clinic stated, in part: "[McDermott] had received IVIG [two] weeks prior to the event, which we felt was unrelated, given the timing. However, we still felt that the stroke may have in some way been related to her underlying rheumatologic disease (dermatomyositis), as strokes have been seen with this disease entity."

## V. CONCLUSIONS OF LAW

### A. ALJ's Disability Determination

The ALJ determined that McDermott is not disabled. In determining whether a claimant is disabled, the ALJ must complete a five-step evaluation. *See* 20 C.F.R. § 404.1520(a)–(f); *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987); *Page v. Astrue*, 484 F.3d 1040, 1042 (8th Cir. 2007). The five steps are:

(1) If the claimant is engaged in substantial gainful activity, disability benefits are denied.

(2) If the claimant is not engaged in substantial gainful activity, her medical condition is evaluated to determine whether her impairment, or combination of impairments, is medically severe. If the impairment is not severe, benefits are denied.

(3) If the impairment is severe, it is compared with the listed impairments the Secretary acknowledges as precluding substantial gainful activity. If the impairment is equivalent to one of the listed impairments, the claimant is disabled.

16

(4)  If there is no conclusive determination of severe impairment, then the Secretary determines whether the claimant is prevented from performing the work she performed in the past.  If the claimant is able to perform her previous work, she is not disabled.

(5)  If the claimant cannot do her previous work, the Secretary must determine whether she is able to perform other work in the national economy given her age, education, and work experience.

*Trenary v. Bowen*, 898 F.2d 1361, 1364 n.3 (8th Cir. 1990) (citing *Yuckert*, 482 U.S. at 140–42); *see also* 20 C.F.R. § 404.1520(a)–(f).

McDermott has the burden of proving that her RFC renders her disabled in the first four steps.  *Goff v. Barnhart*, 421 F.3d 785, 790 (8th Cir. 2005) (citing *Eichelberger v. Barnhart*, 390 F.3d 584, 590-91 (8th Cir. 2004)).  If she meets this burden, the burden of proof then shifts to the Commissioner to demonstrate that McDermott retains the RFC to perform a significant number of other jobs in the national economy that are consistent with her impairments and vocational factors such as age, education and work experience.  *Id.* (citing *Eichelberger*, 390 F.3d at 591).  The RFC is the most an individual can do despite the combined effect of all of his or her credible limitations.  20 C.F.R. § 416.945.  "'It is the ALJ's responsibility to determine a claimant's RFC based on all relevant evidence, including medical records, observations of treating physicians and others, and claimant's own descriptions of his [or her] limitations.'"  *Tellez v. Barnhart*, 403 F.3d 953, 957 (8th Cir. 2005) (quoting *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001)).  "The ALJ must first evaluate the claimant's credibility before determining a claimant's RFC."  *Id.* (citing *Pearsall*, 274 F.3d at 1218).  If the claimant cannot make an adjustment to other work that exists in significant numbers in the national economy, then the ALJ will find the claimant is disabled.  20 C.F.R. § 404.1520(g)(1).  At step five, even though the burden

of production shifts to the Commissioner, the burden of persuasion remains on the claimant. *Goff*, 421 F.3d at 790.

Under the first step of the analysis, the ALJ determined that McDermott had not engaged in substantial gainful activity since June 24, 2002. At the second step, the ALJ determined that McDermott had two severe impairments, namely, dermatomyositis and status post stroke. At the third step, the ALJ found that McDermott's impairments were not equivalent to one of the listed impairments, because the impairments are "'severe' within the meaning of the Regulations but not 'severe' enough to meet or medically equal, either singly or in combination[,] to [sic] one of the impairments listed . . . ." McDermott does not dispute these three findings.

At the fourth step, the ALJ determined McDermott's RFC as follows:

> [McDermott] retains the [RFC] to perform the exertional demands of sedentary work, or work which is generally performed while sitting and does not require lifting in excess of ten pounds. She can sit for about 6 hours in an 8-hour workday, and stand/walk at least 2 hours in an 8-hour workday. She can occasionally climb ramps/stairs, balance, stoop, kneel, crouch, and crawl. She is precluded from climbing ladders/ropes/scaffolds. She should avoid concentrated exposure to temperature extremes, unprotected heights, and hazardous machinery due to dermatomyositis with proximal muscle weakness. The claimant is capable of doing sustained work activities in an ordinary work setting on a regular and continuing basis . . . .

Because the ALJ determined that McDermott could only perform limited tasks, he found that she could not return to her past relevant work as a custodial supervisor. At the fifth step, however, the ALJ determined that McDermott was able to make a vocational adjustment to sedentary work that exists in significant numbers in the national economy. Thus, the ALJ concluded that McDermott was "not disabled."

Case 1:06-cv-00014-LRR   Document 16   Filed 07/31/07   Page 18 of 24

McDermott alleges that the ALJ erred in several respects. McDermott argues that the ALJ erred in determining her RFC because the ALJ inappropriately gave deferent weight to the consulting physicians, especially Dr. Schuett. McDermott argues that the ALJ's RFC was not supported by substantial evidence on the record. McDermott also argues that the ALJ failed to account for possible environmental limitations in his RFC and the Commissioner failed to prove that other work existed in the national economy.

### B. McDermott's RFC

McDermott argues that the ALJ erroneously relied upon consulting physicians assessments, namely, the assessments of Dr. Wilson and Dr. Elliot, to determine her RFC. McDermott seeks to have the ALJ's determination of the RFC reversed because it is not supported by substantial evidence on the record. Specifically, she argues that the ALJ wrongly discounted evaluations by Dr. Paul Guido and Dr. Collins regarding her impairments. The Commissioner argues that the ALJ gave proper weight to McDermott's testimony, her medical records and the physicians' observations and, therefore, correctly determined McDermott's RFC after considering all of the relevant evidence.

Before determining an RFC, the ALJ must make a credibility determination. *See Tellez*, 403 F.3d at 957. Here, the ALJ determined that McDermott was not fully credible. (Record at 25 ("The undersigned finds the claimant's allegations regarding her limitations are not totally credible . . . .")). McDermott, however, does not argue that the ALJ's findings regarding her credibility were erroneous. Therefore, the court shall turn to consider whether substantial evidence supported the ALJ's RFC finding.

The Eighth Circuit Court of Appeals has instructed:

> A treating physician's opinion should not ordinarily be disregarded and is entitled to substantial weight. A treating physician's opinion regarding an applicant's impairment will be granted controlling weight, provided the opinion is well-supported by medically acceptable clinical and laboratory

19

> diagnostic techniques and is not inconsistent with the other
> substantial evidence in the record.

*Singh v. Apfel*, 222 F.3d 448, 452 (8th Cir. 2000) (citations omitted); *see also* 20 C.F.R. § 404.1527(d)(2). The regulations require the ALJ to give reasons for giving weight to or rejecting the statements of a treating physician. *See* 20 C.F.R. § 404.1527(d)(2); *see also Prosch v. Apfel*, 201 F.3d 1010, 1013 (8th Cir. 2000) ("Whether the ALJ grants a treating physician's opinion substantial or little weight, the regulations provide that the ALJ must 'always give good reasons' for the particular weight given to a treating physician's evaluation." (quoting 20 C.F.R. § 404.1527(d)(2))). "The ALJ is required to assess the record as a whole to determine whether treating physicians' opinions are inconsistent with substantial evidence on the record." *Travis v. Astrue*, 477 F.3d 1037, 1041 (8th Cir. 2007) (citing 20 C.F.R. § 404.1527(d)(2)). The ALJ accords "controlling weight" to treating physicians' conclusions unless the ALJ finds the opinions to be "'inconsistent with or contrary to the medical evidence as a whole . . . .'" *Id.* (quoting *Hacker v. Barnhart*, 459 F.3d 934, 937 (8th Cir. 2006) and *Edwards v. Barnhart*, 314 F.3d 964, 967 (8th Cir. 2003)).

Generally, "'[t]he opinion of a consulting physician who examines a claimant once'" does not constitute "'substantial evidence.'" *Anderson v. Barnhart*, 344 F.3d 809, 812 (8th Cir. 2003) (quoting *Kelley v. Callahan*, 133 F.3d 583, 589 (8th Cir. 1998)). There are two exceptions to that general rule. *Id.* An ALJ's decision to credit a one-time consulting physician's opinion and discount a treating physician's opinion should only be upheld: "'(1) where [the one-time] medical assessments are supported by better or more thorough medical evidence, or (2) where a treating physician renders inconsistent opinions that undermine the credibility of such opinions.'" *Id.* (quoting *Cantrell v. Apfel*, 231 F.3d 1104, 1107 (8th Cir. 2000)).

Moreover, when the claimant is a new patient to the treating physician, that physician's opinion need not be given the controlling weight that is typically given to a

20

treating source. *See Randolph v. Barnhart*, 386 F.3d 835, 840 (8th Cir. 2004) ("[The treating physician's] March letter . . . is not entitled to controlling weight as a medical opinion of a treating source. When [the treating physician] filled out the checklist, [she] had only met with [the claimant] on three prior occasions."). The regulations state: "Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight [the Commissioner] will give to the source's medical opinion." 20 C.F.R. §§ 404.1527(d)(2)(i) and 416.927(d)(2)(i).

The ALJ gave "particular weight" to the RFC assessments completed by consulting physicians Dr. Elliot and Dr. Wilson, and he also stated that those assessments were consistent with the opinion of consulting physician Dr. Schuett. The ALJ stated that "[t]he record does not contain any opinions from treating or examining physicians indicating that the claimant is disabled or even has limitations greater than those determined in this decision." To the contrary, some of the evidence from McDermott's treating physicians does suggest that she is disabled and incapable of returning to work. In October of 2002, Dr. Collins found that McDermott was "unable to return to full-time competitive employment" and was also incapable of driving. On April 24, 2003, Dr. Paul Guidos opined that McDermott was "completely and totally disabled secondary to the dermatomyositis which causes a severe myopathy or muscle weakness." Good reasons may exist for discrediting the opinions of these treating physicians, but the ALJ provided no reasons for failing to credit their opinions. *See* 20 C.F.R. § 404.1527(d)(2) (requiring the ALJ to give reasons for rejecting the statements of a treating physician); *Prosch*, 201 F.3d at 1013 (explaining that an ALJ may discount or disregard an opinion, if the treating physician has offered inconsistent opinions); *Woolf v. Shalala*, 3 F.3d 1210, 1214 (8th Cir. 1993) (determining that an ALJ can properly discredit a medical opinion when it is based on incomplete medical evidence and relies on a patient's complaints of pain).

A review of the record reveals that Dr. Paul Guidos was one of McDermott's primary health care providers in 2002 and 2003. The court finds that the ALJ failed to give proper weight to the opinion of Dr. Paul Guidos. *Ellis v. Barnhart*, 392 F.3d 988, 994 (8th Cir. 2005). Although the ultimate decision regarding disability is reserved for the Commissioner, a treating physician's opinion regarding a claimant's impairment should be controlling where it is supported by other substantial evidence in the record. *Id.* at 994-95. Dr. Paul Guidos conducted several comprehensive examinations of McDermott, the most recent one being on June 24, 2003, and he made detailed findings regarding the impact of her medical condition on her ability to function. Yet, the ALJ discredited Dr. Paul Guidos's opinion without giving reasons for doing so. This was error. *Reeder v. Apfel*, 214 F.3d 984, 989 (8th Cir. 2000) ("We conclude that the ALJ erred by making his own estimate of Ms. Reeder's IQ level, absent any support in the medical evidence and without specifically discrediting the estimate of the sole mental health examiner in this case."). In his analysis, the ALJ also did not give reasons for failing to mention the three-day evaluation performed in October of 2002 by Dr. Collins, who concluded that McDermott was unable to return to full-time competitive employment due to her physical impairments and "several areas of cognitive deficit."

The ALJ's determination that McDermott was not disabled is not supported by substantial evidence. Despite the ALJ's justification for giving "particular weight" to the opinions of the consulting physicians, he failed to develop the record fully to support his decision that McDermott is not disabled. As McDermott points out, on April 24, 2003, Dr. Paul Guidos stated that she had "significant deficits" in her upper and lower extremities and her gait was "tenuous with some poor balance skills." In June of 2003, Dr. Paul Guidos reported that "endurance and fatigue issues continue to be problematic." These opinions by the treating physician are supported by Dr. Schuett's conclusion in January of 2005 that, although McDermott had only "very mild decreased muscle strength

22

overall," it was Dr. Schuett's opinion that "she probably wears out and tires very easily even though her overall strength is not decreased significantly at this point." Due to these concerns, Dr. Schuett concluded that McDermott would "probably need frequent breaks" if she were to work in a sedentary position.

The court finds that the ALJ did not comply with the regulations, because he did not give reasons for discrediting the opinion of Dr. Paul Guidos. *Travis*, 477 F.3d at 1041; 20 C.F.R. § 404.1527(d)(2). The ALJ's determination of McDermott's RFC was influenced by his finding that the record lacked opinions from treating physicians indicating that McDermott was disabled. The ALJ's determination of the RFC is not supported by substantial evidence.

### C. Reversal or Remand

The scope of a district court's review of the Commissioner's final decision is set forth in 42 U.S.C. § 405(g) which provides, in part, that:

> [t]he court shall have the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Secretary, with or without remanding the cause for a rehearing.

42 U.S.C. § 405(g). The Eighth Circuit Court of Appeals has stated that:

> [w]here the total record is overwhelmingly in support of a finding of disability and the claimant has demonstrated his disability by medical evidence on the record as a whole, we find no need to remand.

*Gavin*, 811 F.2d at 1201; *see also Beeler v. Brown*, 833 F.2d 124, 127 (8th Cir. 1987) (finding reversal of denial of benefits was proper where "the total record overwhelmingly supports a finding of disability"); *Stephens v. Sec'y of Health, Educ., & Welfare*, 603 F.2d 36, 42 (8th Cir. 1979) (explaining that reversal of denial of benefits is justified where no substantial evidence exists to support a finding that the claimant is not disabled).

In the present case, the court concludes that the medical records as a whole do not "overwhelmingly support[] a finding of disability." *Beeler*, 833 F.2d at 127. Instead, the ALJ simply failed to give reasons for discounting the opinion of McDermott's examining and treating sources. Accordingly, the court finds that remand is appropriate.

Upon remand, the ALJ should develop the record fully and fairly, and he should issue an opinion regarding McDermott's disabilities that is supported by substantial evidence, including the fact that the most recent physician to examine her, the DDS consulting physician, concluded that she tires easily and will need frequent breaks if she engages in sedentary work. *See Driggins v. Harris*, 657 F.2d 187, 188 (8th Cir. 1981) (explaining that the ALJ has a duty to develop the record fully and fairly). It is the court's opinion that testimony from a vocational expert would aid significantly in making a full and fair record in this matter. *See Ellis*, 392 F.3d at 996 (discussing the requirement for vocational expert testimony and stating that "[t]he ALJ may not rely on the [Medical-Vocational Guidelines] if [the claimant] suffers from non-exertional impairments, but instead must obtain the opinion of a vocational expert").

## VI. DISPOSITION

For the foregoing reasons, it is hereby **ORDERED** that this matter is **REMANDED** to the Commissioner of Social Security pursuant to sentence four of 42 U.S.C. § 405(g), for further proceedings as discussed herein.

**IT IS SO ORDERED.**

**DATED** this 31st day of July, 2007.

LINDA R. READE
CHIEF JUDGE, U.S. DISTRICT COURT
NORTHERN DISTRICT OF IOWA

24